# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 24-173** |
| KALIEN FRAZIER | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Kalien Frazier served as a customer service representative for Bank 1, receiving and processing the sensitive personal and financial information of bank customers.  On May 7, 2022, Victim 1 called Bank 1 to set up online banking and activate a debit card.  Victim 1 understandably trusted that the bank's employees would act professionally, affirmatively protect Victim 1's personal information, and only use it to assist Victim 1.  But Victim 1 was routed to the defendant, who had decided to breach his obligations to both the bank and Victim 1 for his own personal gain.  Instead of helping Victim 1, the defendant chose to steal Victim 1's financial information so that he could sell it online to a scammer.  Indeed, after the call, the defendant sold Victim 1's information for $250 on an encrypted, invite-only chatroom called "New Scamfily GC Update."  During this sale, the defendant even coached the purported illicit purchaser on how to exploit Bank 1's policies to extract the most value from Victim 1's debit card, writing, "the card has a daily spending of 10k stay under 9900 and you'll be good but you can go crazy."

Unknown to the defendant, this particular purchaser was not a scammer, but instead was an undercover federal agent with the Electronic Crimes Unit of the Federal Deposit Insurance Corporation Office of Inspector General ("FDIC OIG"), a specialized law enforcement agency that pursues cases involving sophisticated illicit schemes of bank fraud, cybercrime, and other

fraudulent activities affecting FDIC-supervised or insured institutions.  As a result, the defendant's fraud upon Victim 1 was thwarted.  Nonetheless, the defendant's theft of personal and banking information from Victim 1, a real person, in order to sell it to a scammer was a classic case of aggravated identify theft.

Following the investigation of this fraudulent conduct, the defendant was charged with aggravated identity theft, as well as multiple counts of wire fraud.  He subsequently pleaded guilty to all but one of these counts.  For this identity theft scheme, he now faces a mandatory minimum sentence of 24 months' imprisonment, and the government respectfully submits that a within-guideline sentence is the appropriate punishment in this case, absent any basis for a lesser sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1] At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted); *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough

---

[1]  Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.      BACKGROUND

Following an indictment on April 30, 2024, the defendant pled guilty on December 5, 2025, without a plea agreement to five counts of wire fraud under 18 U.S.C. § 1343 (Counts 1-5) and one count of aggravated identity theft under 18 U.S.C. § 1028A (Count 7).  During that sentencing hearing, the defendant agreed with the factual basis for those six counts: he had sold the debit card information of Victim 1, a real person, to an undercover employee of FDIC OIG, who was posing as a fraudster.  *See* Exhibit A, Transcript of December 5, 2026 Change of Plea Hearing.  The defendant's sentencing hearing is scheduled for June 3, 2026.

## II.     SENTENCING CALCULATION

### A.      Statutory Maximum and Mandatory Minimum Sentence

Counts One through Five (18 U.S.C. § 1343 (wire fraud)): a maximum of 20 years' imprisonment per count; a three-year period of supervised release; a $250,000 fine; and a $100 special assessment.

Count Seven (18 U.S.C. § 1028A (aggravated identity theft)): a statutory maximum and minimum of 2 years' imprisonment consecutive to any underlying conviction; a maximum one-year period of supervised release; a $250,000 fine; and a $100 special assessment.

In total, the defendant faces a mandatory minimum of 2 years' imprisonment, a maximum of 102 years' imprisonment, three years of supervised release, a $1,500,000 fine, and a $600 special assessment.

### B.      Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range as 24 to 30 months: his guideline range with a total offense level of 3 and a criminal history score of I is 0 to 6 months, but the 24-month mandatory minimum consecutive sentence under 18 U.S.C. § 1028A brings his guideline range to 24 to 30 months.  PSR ¶ 89.  The defendant also faces a guideline range of not more than three years of supervised release, PSR ¶ 94, and a guideline range of a fine of $200 to $9,500, PSR ¶ 100.

## III.   ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543.  "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

The government accordingly discusses the Section 3553(a) factors below:

### 1.    The Nature and Circumstances of the Offense and the Seriousness of the Offense, Respect for the Law, and Just Punishment

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  This case involves a profound breach of trust: while working as a bank customer service representative, the defendant stole the personal and financial information of a bank customer seeking assistance, sold this information in an online fraud forum, and advised the buyer on how to game the bank's safeguards to extract as much money as possible from the customer's account.  Among his Telegram postings, the defendant wrote: "I work for the merchant I get the number from they hits for fact and I give yoU the daily limit so u know wat all you can hit for so u can hit before the close the card."  Notably, by using the expression "they hits," the defendant implied that he was selling the personal and financial information of multiple victims.  Moreover, in this and other postings, the defendant touted the legitimacy of the information that he was selling.

What makes the defendant's crimes more serious is that he took active efforts to cover his tracks. For instance, after obtaining and recording Victim 1's banking information, the defendant waited 74 days from the phone call with the victim to sell the information. This delay demonstrates what appears to be a concerted effort to disguise and conceal the source of the stolen financial information. And when the defendant decided the time was right to market this valuable information, he did not merely sell it to an associate. Instead, he accessed an encrypted application called Telegram and offered Victim 1's banking information in an invite-only group chat dedicated to scams. Indeed, this group was called "New Scamfily GC Update."

Despite this intentional betrayal of his employer and his theft of Victim 1's information, the defendant's response to this investigation has been to deny his responsibility at almost every turn. During a recorded interview in August 2023 with the agents executing a search warrant at his residence, the defendant said, "I had no information or knowledge in regards to" any fraud. At the time, Bank 1 had fired him after learning of the fraud, but the defendant claimed his "termination was unjust" because "there was no supporting evidence of it, nor was there any knowledge." The defendant falsely insisted: "I'm being thrown under the bus." When asked directly about whether he had sold anyone's information, the defendant stated, "I didn't sell no [Bank 1] account information." When confronted with evidence of the sale of Victim 1's information on Telegram, the defendant blamed his 17-year-old cousin, who he claimed must have accessed the defendant's electronic devices.

Over two years later, the defendant finally came clean and pleaded guilty to six federal offenses connected with the sale of Victim 1's identity. But despite the defendant's recent claim, "I take full responsibility for my actions," PSR ¶ 20, he persists in minimizing the scope of his conduct: his objections to the presentence report ask the Court to view his crime and all relevant

conduct as having a total loss amount of zero dollars (because the undercover federal agent did not use the stolen identity to commit further frauds, and any suggestion of additional crimes "is not supported by the evidence").

Contrary to the defendant's assertions, the evidence demonstrates that this case is not about a one-time decision to risk the defendant's career for a single $250 payday. Rather, it shows that the defendant stole his customers' financial information on multiple occasions. Agents searching the defendant's residence nine months after the sale of Victim 1's identity found a piece of paper with the name and financial information of another potential victim in handwriting. And this is consistent with the defendant repeatedly committing this crime: he was a member in the invite-only encrypted group chat devoted to scams, and he knew to provide information about Bank 1's internal controls to the purported buyer. The issue for the government at sentencing, however, is that the defendant appears to have been exceptionally careful about how he committed these crimes. As a result, even after exhaustive review of the evidence in this case, it is difficult to attribute additional, specific fraudulent transactions or losses to the defendant.

During the investigative stage of this case, Bank 1 provided the government with a loss calculation of approximately $670,000, and produced documentation listing about 670 customers who it suspected were victims of this fraud. The government initially relied on Bank 1's loss estimate but later determined that this estimate was overinclusive and premised upon the bank's liberal refund measures. As a result, the government asked Bank 1 to prepare a more exacting loss calculation.

Bank 1 did so, calculating the loss to be $1,179.96. To arrive at this loss amount, Bank 1 reviewed the call recordings that it had retained between the defendant and bank customers – a

small subset of the total calls – and identified the recordings in which the customer had provided the defendant with a debit card's card verification code or card verification value (i.e., the three- or four-digit number printed on the card for security purposes). Next, the bank identified potentially fraudulent transactions on those customers' accounts which occurred after the customers had spoken to the defendant, and used the total dollar value of those transactions as the fraud loss.

Bank 1's revised loss calculation, however, does not affect whether the defendant committed aggravated identity theft or whether a two-year mandatory sentence is warranted. The evidence is clear that the defendant committed that crime: he stole Victim 1's financial information in relation to a wire fraud, he knew that Victim 1 was a real person, and he attempted to sell this financial information to a scammer who he believed would defraud Victim 1. And he did all of this while employed by Bank 1, targeting victims who believed they could trust him. This case, at its core, is about whether customers who call their own financial institutions for help can trust the person on the other end of the phone. And as described more fully below, a bank insider selling customer information on encrypted messaging apps is the exact type of conduct that Congress hoped to address through the enactment of the two-year mandatory minimum sentence prescribed by 18 U.S.C. § 1028A. The whole point of the mandatory minimum provision is to punish the conduct itself, rather than the resulting loss amount. That approach is especially appropriate here, as the loss as to Victim 1 is zero dollars only because the defendant was caught during a sting operation. Thus, the government submits that the nature and seriousness of the offense fully merit the statutory mandatory minimum sentence applicable in this case.

### 2.    The History and Characteristics of the Defendant

The defendant's history and characteristics do not significantly aggravate or mitigate his posture before the Court. The defendant was raised in Oakland, California, by his parents.  PSR ¶ 42.  He is married and now lives with his wife in Tracy, California.  PSR ¶¶ 45, 47.  The defendant attended college and reports being two courses short of an associate degree, which he intends to complete.  PSR ¶¶ 70, 73.  He is currently employed as a neighborhood change agent in Stockton, California, but also has an employment history that includes working at Tesla, for DoorDash, and as a clerk.  PSR ¶¶ 74-79.  The Probation Office assesses that the defendant does have the ability to "pay a fine at the low end of the guideline range."  PSR ¶ 85.  This background shows that the defendant was fortunate enough to have a relatively stable upbringing and clearly had the means to support himself and his wife without resorting to fraud.

### 3.      Deterrence and Protection of the Public

A sentence of twenty-four months' incarceration will provide general and specific deterrence, and will protect the public.

General deterrence of individuals inclined to commit aggravated identity theft is particularly important here.  As FDIC OIG has recently warned, consumers in the United States are routinely targeted by aggressive fraudsters, including through ATM jackpotting, call spoofing, impersonation, and crypto confidence scams.[2]  While it is difficult to protect oneself from these frauds – which generally involve strangers contacting their targets – U.S. consumers can do so by exercising a high degree of diligence and skepticism.[3]  Such preventative actions, however, are ineffective against this type of fraud: Victim 1 simply could not avoid a bank

---

[2] https://content.govdelivery.com/accounts/USFDIC/bulletins/40cc9f6.

[3] https://www.fdicoig.gov/pig-butchering-scams?source=govdelivery&utm_medium=email&utm_source=govdelivery.

employee stealing banking credentials during a routine customer service call.  Bank customers

expect and deserve absolute confidentiality regarding their personal financial data and rely on

their bank's strict, proactive security measures to guarantee complete protection against

fraudulent activity.  In his role as a customer service representative, the defendant occupied a

trusted position within the financial system, a role necessary for bank customers to conduct the

daily financial transactions required to pay bills and buy groceries.  The defendant's conduct was

a blatant breach of trust which placed in jeopardy consumer confidence in our banking system.

This aggravated identity theft struck directly at the heart of this system.  As a result, his

conviction under 18 U.S.C. § 1028A will punish exactly the type of conduct that this statute was

enacted to deter.  As one congressperson explained in recommending passage of the statute:

> This legislation . . . addresses a prevalent mode of identity theft
> which is committed by insiders of organizations who illegally use
> or transfer individuals' identifying information which has been
> entrusted to them.  This is an increasing problem which we must
> protect all our consumers from.

150 Cong. Rec. H4808-01, 150 Cong. Rec. H4808-01, H4810, 2004 WL 1402606.  Another

congressperson echoed the same sentiment, noting that the statute's intent was to "respond to the

ever-growing problem of insider theft.  A peer review study will be coming out later this year

that will show perhaps as much as 70 percent of identity theft cases are facilitated through the

workplace."  150 Cong. Rec. H4808-01, 150 Cong. Rec. H4808-01, H4811, 2004 WL 1402606.

The two-year mandatory minimum sentence under Section 1028A will also serve as

specific deterrence to the defendant, who committed his crimes while working for a bank and

who still minimizes the scope and impact of these crimes.  Such specific deterrence was an

explicit purpose of the two-year mandatory minimum under the Identity Theft Penalty

Enhancement Act.  The legislative history identified the problem: "Currently under 18 U.S.C.

§ 1028 many identity thieves receive short terms of imprisonment or probation; after their release, many of these thieves will go on to use false identities to commit much more serious crimes." H.R. REP. 108-528, 3, 2004 WL 1260964, 3, 2004 U.S.C.C.A.N. 779, 779. Congress believed that the mandatory minimum provision of the statute was critical to enhance general deterrence, because "[u]nder current law, many perpetrators of identity theft receive little or no prison time. That has become a tacit encouragement to those arrested to continue to pursue such crimes." H.R. REP. 108-528, 5, 2004 WL 1260964, 5, 2004 U.S.C.C.A.N. 779, 781. The mandatory minimum sentence at issue here will properly serve this purpose.

### 4.    The Need for Training, Medical Care, or Other Correctional Treatment

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D). While serving an appropriate sentence, the defendant will have the opportunity to take advantage of educational or vocational training.

### 5.    The Need to Avoid Unwarranted Sentencing Disparities

A sentence within the sentencing guidelines will avoid unwarranted sentencing disparities for two reasons.

*First*, the guideline range does not take into account intended loss. Of course, there is no dispute that the defendant's guideline range must be calculated based on the actual loss that he caused. And there is no dispute that whether the actual loss is $0 or $1,179.96 will not affect his guideline range. But this narrow focus upon actual loss does not capture the full scope of the defendant's crimes; it merely reflects a brief period of time during which the Third Circuit rejected the use of intended loss in calculating guidelines. The defendant's offenses occurred

between March 30, 2022, and August 30, 2023.  PSR ¶ 7.  On November 30, 2022, the Third

Circuit held in *United States v. Banks* that because references to "intended loss" appeared in

commentary to U.S.S.G. § 2B1.1, rather than in the Guideline itself, intended losses could not be

used in calculating a guidelines range.  55 F.4th 246 (3d Cir. 2022).  *Banks* abrogated the Third

Circuit's decades-long practice of affirming sentences based on intended loss and departed from

the practice of every other court in the country. United States Sentencing Commission,

Amendments to the Sentencing Guidelines (Preliminary) (Apr. 17, 2024), available at

https://tinyurl.com/yhk2awdy (noting that "approximately 50" defendants "were sentenced using

intended loss in fiscal year 2022 . . . in the Third Circuit prior to the *Banks* decision.").  In

November 2024, the United States Sentencing Commission amended § 2B1.1 to ensure that

intended loss is once again considered within the Third Circuit.  *Id*.  But for a period of 23

months, the Third Circuit – and only the Third Circuit – barred sentencing courts from

considering intended loss in calculating a guideline range.

This anomaly benefits the defendant, who told the undercover agent, "the card has a daily

spending of 10k stay under 9900 and you'll be good but you can go crazy."  His unmistakable

intent was to sell access to Victim 1's account so the purported purchaser could drain that

account in its entirety, as fast as possible.  Under the pre-*Banks* or current Guidelines, this would

generate an intended loss at least equal to Victim 1's total account balance.  At the time Frazier

spoke to Victim 1 on the phone, this balance was $127,076.81.[4]  But because the defendant sold

the debit card information to an undercover officer, who went straight to the bank rather than

---

[4] For the same reason that the *Banks* court disregarded the Guideline note regarding
intended loss as impermissibly expanding the word "loss," *Banks* also requires the Court to
disregard § 2B1.1 n.3(E)(i), which automatically imputes a $500 loss per debit card in a case like
this.  Again, this inures to the defendant's benefit.

dissipating Victim 1's savings, the actual loss amount with respect to Victim 1 under *Banks* is $0. As a result, the defendant's guideline range is significantly lower than it would be otherwise.

*Second*, the loss amount attributable to the defendant would likely be even higher if he were facing justice in (at least) the First, Second, Fourth, Fifth, Seventh, Eighth, Ninth, or Eleventh Circuits. These circuits cover 35 states, including the state in which the defendant was located at the time of the crime and the state in which Bank 1 is headquartered. These courts calculate intended loss based on card limits, e.g., by "using the daily credit limit multiplied by the number of days [the defendant] possessed the debit card as an estimate of intended loss." *United States v. Lewis*, 312 F. App'x 515, 518 (4th Cir. 2008). For this defendant – who told the undercover agent that Victim 1's "card has a daily spending of 10k," and who possessed the debit card for 74 days (from the date of his call with Victim 1 to the date he tried to sell the card) – that would equate to an intended loss of $740,000. That loss amount would equate to a 14-level increase under USSG § 2B1.1(b)(1)(H). Even absent the enhancement for aggravated identity theft, that would lead to an economic loss guideline of 24 to 30 months – the exact same range as the guidelines calculated in the Presentence Report.

This approach is consistent with the Guidelines, under which intended loss includes even pecuniary harm "impossible or unlikely to occur." USSG § 2B1.1 n.3(A)(ii); *see also United States v. Egemonye*, 62 F.3d 425, 428 (1st Cir. 1995) ("In accord with the presentence report, the district court in this case attributed to [the defendant] an intended loss equal to the aggregate limits of the purchased credit cards."); *United States v. Sandoval*, 293 F. App'x 809, 812 (2d Cir. 2008) ("The evidence here supports the district court's finding that the credit limit on the stolen card Sandoval was using on the date of his arrest was $100,000, and that Sandoval intended to use all of it."); *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993) ("while adopting the

PSR, the district court concluded that 'the intended loss undoubtedly was the credit available under the credit cards.'"); *United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 2003) ("multiplying the average credit limits of cards with known limits by the total number of cards involved in the conspiracy renders a reasonable estimate of the loss."); *United States v. Adejumo*, 772 F.3d 513, 527 (8th Cir. 2014) ("When a defendant obtains access to a credit line, whether by fraudulently applying for credit cards, or by writing counterfeit checks, the district court may infer that the defendant would seek the full value of that line of credit.") (citations omitted); *United States v. Perez*, 967 F.2d 594 (9th Cir. 1992) (unpublished) ("we cannot say that the district court's finding of intended loss equal to the limits on the stolen credit cards was clearly erroneous")*; United States v. Manoocher Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001) ("The sentencing judge determined that the amount of loss in this case was $43,000.00, the amount of the combined credit limits on the cards obtained through the theft of the mail.").

In this case, however, the Third Circuit (a) was not accounting for intended loss during the time that the defendant committed these crimes and (b) has not definitively articulated what intended loss amount should be attributed to "defendants who recklessly transferred [] credit information to a third party, thereby placing the full potential loss at risk." *United States v. Diallo*, 710 F.3d 147, 150 (3d Cir. 2013) (holding that, where a defendant possessed numerous credit cards, "the District Court might simply have incorrectly presumed that the aggregate credit limit alone can make out a prima facie case for intended loss amount in a credit card fraud."). Very simply, the guidelines range in the Presentence Report – which would be 0 to 6 months absent the enhancement for aggravated identity theft – is lower than it would be for a defendant who committed the same crimes before or after the *Banks* decision or a defendant prosecuted in another Circuit.  Accordingly, the 24 to 30 month guideline range, as enhanced by 18 U.S.C.

§ 1028A, appropriately avoids sentencing disparities compared to such similarly situated defendants.

## IV.    CONCLUSION

For the foregoing reasons, as well as the reasons set out in the sealed supplement to this memorandum, the government recommends a sentence of incarceration within the guidelines.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Patrick Brown*
LINWOOD C. WRIGHT
PATRICK BROWN
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this Sentencing Memorandum has been served by email on:

Jesse Smith, Esq.


/s Patrick Brown
PATRICK BROWN
Assistant United States Attorney


DATED:  May 27, 2026

# EXHIBIT A

```
              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES of AMERICA .
                         . Case No. 2:24-cr-173-1
         Plaintiff,      .
  -v-                    . James A. Byrne U.S. Courthouse
                         . 601 Market Street
KALIEN FRAZIER           . Philadelphia, PA 19106
                         .
         Defendant.      .December 5, 2025
                         . 12:28 p.m.
. . . . . . . . . . . . . .
```

TRANSCRIPT OF CHANGE OF PLEA HEARING
BEFORE HONORABLE KELLEY B. HODGE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:        PATRICK BROWN, ESQ.
                          U.S. ATTORNEY'S OFFICE
                          615 Chestnut Street, Suite 1250
                          Philadelphia, Pennsylvania 19106
                          (215) 861-8670


For the Defendant:

                          JESSE SMITH, ESQ.
                          FEDERAL COMMUNITY DEFENDER OFFICE
                          601 Walnut Street, Suite 540 West
                          Philadelphia, PA 19106
                          215-928-1100
                          jesse.smith@fd.org


Court Reporter:           Leesa Ciamaichelo

Transcription Service:    Burke Court Reporting, LLC
                          P.O. Box 415
                          Wayne, NJ 07474
                          (973) 692-0660


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

PROCEEDINGS                                                    PAGE

Court and Witness colloquy                                    5

Defendant enters Plea                                         13

Judge's Decision                                              29

P R O C E E D I N G S

(12:28 p.m.)

(Call to Order of the Court.)

THE COURT:  Good afternoon.  You may be seated.

MR. SMITH:  Good afternoon.

MR. BROWN:  Good afternoon.

THE COURT:  Counsel, if you could please introduce yourselves to the court for the record and then I will ask Mr. Frazier to introduce himself last.

MR. BROWN:  Good morning, Your Honor.  Patrick Brown for the government.

MR. SMITH:  Good morning.  Jesse Smith for the Federal Community Defender Office.

MR. FRAZIER:  Good morning, Kalien Frazier.

THE COURT:  Good afternoon, I think.  We just hit afternoon.  I might have led with morning.  But counsel and Mr. Frazier, good to see you all.  I will extend my apologies, I had a matter prior to this that just finished or concluded a little bit after 12, so that pushed us back a few minutes.  So this was the soonest that I could get us started this afternoon.

But what we are here for today, it's the court's understanding that Mr. Frazier intends on entering a guilty plea this afternoon.  And so I want to make sure that I ask both counsel whether or not this matter needs to be sealed at

all.  I don't have any impression that it does, but I always like to check first.

MR. BROWN:  Not from the government's perspective, Your Honor.

THE COURT:  Thank you.

MR. SMITH:  No, Your Honor.

THE COURT:  Thank you.

As I stated, we're here in the case of the United States v. Kalien Frazier, Case No. 24-cr-173.  The defendant, Mr. Frazier, was charged by way of an indictment issued on April the 30th of 2024, with Counts 1 through 6 being wire fraud in violation of 18 U.S.C. § 1343, and Count 7, which is aggravated identity theft; that is pursuant to section -- or rather 18 U.S.C. § 1028A.

It's my understanding that the defendant will be entering a guilty plea this afternoon without a plea agreement to Counts 1 through 5, and Count 7 of the indictment, and that is the purpose of the hearing this afternoon.

I want to ensure that I'm accurate in that regard, so am I accurate in that, Mr. Brown?

MR. BROWN:  Yes, Your Honor.

THE COURT:  Mr. Smith.

MR. SMITH:  You are accurate, Your Honor.

THE COURT:  Thank you.

Before we proceed further, I'm going to issue an oral

order pursuant to Federal Rule of Criminal Procedure 5(f).

I hereby issue an order that is confirming that the government recognizes its obligation pursuant to Brady v. Maryland and Giglio v. the United States, and subsequent cases, to timely disclose information favorable to the defense as to criminal liability on the charged offenses or mitigation of any punishment that may be imposed.  I remind the government's counsel that failure to comply with these disclosure obligations may result in consequences, such as the exclusion of evidence, dismissal of a charge or charges, contempt proceedings, disciplinary referral, and any other relief that is authorized by law.

I will enter a written order subsequent to today's proceedings confirming the same, but I ask you, Mr. Brown, do you recognize your obligations?

MR. BROWN:  Yes, Your Honor, I do.

THE COURT:  Thank you.

Mr. Frazier, I have a few questions for you, sir. I'm going to ask you now to stand so you can be sworn.

KALIEN FRAZIER, DEFENDANT, SWORN

THE COURT:  You may have a seat, sir.

I'm just going to ask you to keep your voice up and speak into the microphone.  During this proceeding, I am going to ask a number of questions of you and explain some things to you, and if at any time you do not understand my question or

what I'm trying to explain, you may interrupt me, tell me that you don't understand, and I will ask it or explain it in another way, or I may ask your counsel to speak with you privately, to go ahead and discuss it with you, and then to confirm that you do understand.

If at any time you want to talk with your lawyer, please let me know.  I will give you as much time as you need to speak with your lawyer and to speak with him privately so that I can assure myself that you understand what I just stated.

Have you -- or rather, do you understand what I just commented to you about what I need you to do at this point?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And so I want you to make sure that your answers are clearly heard.  So, just I know it's kind of intuitive to sometimes nod or shake your head.  I'm going to ask you to avoid doing that.  If you do, I will do this, or I will just say, please articulate your answer audibly, okay?

THE DEFENDANT:  Okay.

THE COURT:  Now that you've been placed under oath, Mr. Frazier, it means that if you answer any question falsely, your answer could later be used against you in a prosecution for perjury or for making false statements.  These would be offenses that would be in addition to the ones to which you're pleading guilty to today.

Do you understand that, sir?

THE DEFENDANT:  Yes.

THE COURT:  Do you also understand that I'm going to ask questions of you to satisfy myself that you are competent and able to enter a plea and to satisfy myself that you are knowingly and voluntarily giving up your rights in entering the plea?

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Sir, could you please state for the court your full name?

THE DEFENDANT:  Kalien Frazier.

THE COURT:  Okay.  Have you gone by or used any other names?

THE DEFENDANT:  No.

THE COURT:  Where were you born?

THE DEFENDANT:  Oakland, California.

THE COURT:  And how old are you as you sit here today?

THE DEFENDANT:  Thirty-one.

THE COURT:  And what's your date of birth?

THE DEFENDANT:  11/22/1994.

THE COURT:  How far did you go in school?

THE DEFENDANT:  Community college.  Then again, probably two classes away from AA.

THE COURT:  Okay.  And can you read, write, and understand the English language?

THE DEFENDANT:  Yes.

THE COURT:  And when you say AA, associate's degree was what you were two credits away from --

THE DEFENDANT:  Correct.

THE COURT:  -- am I correct?

Have you ever been treated for or do you currently have a drug or alcohol addiction?

THE DEFENDANT:  No, I do not.

THE COURT:  Okay.  Have you ever been treated for in the past or are you currently being treated for a mental illness?

THE DEFENDANT:  Yes.

THE COURT:  What have you been treated for, sir?

THE DEFENDANT:  Acute anxiety and major depression disorder.

THE COURT:  Okay.  How long ago were you diagnosed?

THE DEFENDANT:  Back in 2001.  I'm sorry, 2021.

THE COURT:  Are you under doctor's care currently?

THE DEFENDANT:  Yes, I am.

THE COURT:  And what prescription, not the actual prescription, but what are you taking medically for your diagnosis?

THE DEFENDANT:  A series of antidepressants and blood

pressure medicine.

THE COURT:  And so the medication that you have been prescribed by your physician, are you taking it as directed by your physician?

THE DEFENDANT:  Correct.

THE COURT:  Okay.  And so are you taking any other prescriptive or non-prescriptive medication or substances that you have to take or have chosen to take before coming into court today?

THE DEFENDANT:  No.

THE COURT:  Okay.  And so the medication that you've been prescribed that you're taking as directed by your doctor, is that medication in any way causing you to not understand where you are right now?

THE DEFENDANT:  No.

THE COURT:  Is that medication in any way impeding your ability to understand the role of your attorney, the role of the government, and my role in this matter?

THE DEFENDANT:  No.

THE COURT:  Okay.  And so at this point in time, it is my understanding that you understand where you are and why you are here.

Have you had the opportunity and taken the time to discuss with your lawyer the purpose of today's hearing before entering this courtroom?

THE DEFENDANT: Yes.

THE COURT: And did your attorney answer all of your questions?

THE DEFENDANT: Yes.

THE COURT: Is there anything impeding or preventing you from moving forward with entry of your plea today?

THE DEFENDANT: No.

THE COURT: Mr. Frazier, you do understand that you have the right to the assistance of a lawyer at every stage of these proceedings, even if you couldn't afford one. This includes not only for this proceeding, but it would be for trial if you had chosen to go to trial, and for sentencing, and for appeal.

Do you understand that, sir?

THE DEFENDANT: Yes.

THE COURT: Have you had a full opportunity to meet with and discuss all aspects of your case with your attorney?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with the representation of your attorney?

THE DEFENDANT: Yes.

THE COURT: Have you received a copy of the indictment, Mr. Frazier?

THE DEFENDANT: Yes.

THE COURT: Okay. And did you read it?

THE DEFENDANT:  Yes.

THE COURT:  And did your lawyer explain the nature and elements of the charges against you and fully explain to you your trial rights and defenses?

THE DEFENDANT:  Yes.

THE COURT:  Did your lawyer answer all of your questions about the indictment and what it means?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions about the indictment or the nature of the charges contained in the indictment?  Do you have any questions about the indictment?

THE DEFENDANT:  No.

THE COURT:  Okay.  Do you understand, Mr. Frazier, that at some point in time, a grand jury that was composed of at least 16, but not more than 23 individuals met, and that at least 12 of those grand jurors must have found that there was probable cause to believe that you committed the crimes with which you have been charged before an indictment could have been issued?

Do you understand that that process had to take place before an indictment was even issued against you?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Do you understand that by pleading guilty, you are giving up your right to challenge the grand jury process and the indictment that has been returned?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Frazier, it is also my understanding that you've agreed to plead guilty without a plea agreement.

Is that correct?

THE DEFENDANT:  Yes.

THE COURT:  To your counsel, Mr. Smith, without telling me anything about the content of any discussion that you had with your client, I would ask that you just answer yes/no to these two questions I have for you.

Did you discuss with your client whether he should plead guilty or proceed to trial?

MR. SMITH:  Yes.

THE COURT:  And did you inform him of your best professional judgment about the pros and cons of both approaches?

MR. SMITH:  Yes.

THE COURT:  Thank you.

Mr. Frazier, did you discuss with your attorney whether you should plead guilty or proceed to trial?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand the advantages and disadvantages of pleading guilty rather than proceeding to trial?

THE DEFENDANT:  Yes.

THE COURT:  Have you had a full and complete

opportunity to discuss this matter with your attorney?

THE DEFENDANT:  Yes.

THE COURT:  And has anyone threatened you or is anyone forcing you to plead guilty?

THE DEFENDANT:  No.

THE COURT:  Do you wish to plead guilty of your own free will?

THE DEFENDANT:  Yes.

THE COURT:  This is a decision you've come to on your own?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Mr. Frazier, do you understand that on the basis of a guilty plea, you could receive a sentence up to the maximum permitted by law?

THE DEFENDANT:  Yes.  Yes.

THE COURT:  Mr. Brown, at this time, I'm going to ask for the government to please state the maximum penalty, fine, special assessment, forfeiture, if applicable in this case, and any mandatory minimum penalty if it's applicable in this case.

MR. BROWN:  Yes, Your Honor.  The court may impose the following statutory maximum and mandatory minimum sentences on Counts 1 through 5, wire fraud, 20 years imprisonment per count, three years of supervised release, $250,000 fine per count, and a $100 special assessment per count.  And on Count 6 -- I'm sorry, Count 7, this says -- there's an error in my

memorandum, it says 12, it should be Count 7.  Count 7, which is aggravated identity theft, two years imprisonment to be served consecutively to any other term of imprisonment, a one-year term of supervised release, a $250,000 fine, and a $100 special assessment.

THE COURT:  Thank you.

Mr. Frazier, sir, do you understand what the penalties are in this case that have just been stated by the government?

THE DEFENDANT:  Yes.

THE COURT:  Do you also understand that no one can guarantee you what sentence you will receive from me?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Smith, have you had the opportunity to explain the sentencing guidelines and their effect on the defendant to your client?

MR. SMITH:  I have, Your Honor.

THE COURT:  Okay.  I'm now going to speak about the sentencing guidelines specifically.  Although the sentencing guidelines are no longer mandatory, they do constitute one factor that I must consider in determining the sentence I will impose in this case in connection with all the factors that are set forth in 18 U.S.C. § 3553(a).  These factors include the following:  the nature and circumstances of the offense and the history and characteristics of you, the defendant, and the

pertinent Sentencing Commission policy statements such as the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of you, the defendant, and to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Accordingly, I must determine what the applicable or arguably applicable guidelines range is and consider the applicable policy statements. Once I do that, I must determine the facts appropriate for imposing a reasonable sentence that is either a guideline sentence or a non-guideline sentence.

Mr. Frazier, do you understand that I could, in appropriate circumstances, impose a sentence that is less severe or more severe than the sentence which the guidelines recommend?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you are sent to prison, a term of supervised release will be imposed when you are released from prison. If or while you are on supervised release, you would be under the supervision of the probation office. You would have to abide by certain terms and conditions. If you violated any of the terms and conditions of supervised release, your supervised release could be revoked and you could be returned

to prison.  In that event, you would have to serve your original prison sentence, plus additional prison time.

Do you understand that, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  A probation officer will prepare a pre-sentence report in your case.  If you agree with the report, you can ask the probation officer to --rather, if you disagree with the report, you can ask the probation officer to change the report before I see it.  If the probation officer does not change the report, you can ask me to order that the report be changed.  If I do not order the probation officer to change the report because I find that the report is correct, you cannot withdraw your guilty plea on that basis.

Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  If you disagree with the report, your guilty plea will still be binding.  You cannot change your plea from guilty to not guilty.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Do you also understand that your attorney and the government's attorney can agree on, or what's called stipulate, to certain facts and make recommendations, motions, and requests of me at sentencing, but I don't have to do what they ask me to do?  And if I don't do what they ask me to do,

your guilty plea is still binding on you, whether or not I agree with their motions and/or request of the court.

Do you understand that, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you also understand that I will not be able to determine the sentence I will impose in your case until after a pre-sentence report is completed and you and the government have had an opportunity to challenge the facts reported by the probation office and I have had a chance to review all the relevant factors, including the sentencing guidelines?

Do you understand that, sir?

THE DEFENDANT:  Yes.

THE COURT:  I do not know whether or not, Mr. Frazier, you were on any type of supervision in the past. However, if you were on any type of court-directed supervision, such as probation, parole, supervised release, or ARD, which is Accelerated Rehabilitative Disposition, when you committed the offense to which you are pleading guilty, your plea of guilty would be an admission that you violated the terms and conditions of that supervision.

Do you understand that?

THE DEFENDANT:  (No response.)

THE COURT:  Would you like me to repeat it?

THE DEFENDANT:  Yes.  Yes, please.

THE COURT:  If you were on supervision for any reason, like probation, parole, or some other type of court-directed supervision, and you have that in existence at the time that you have alleged to commit these offenses, your plea of guilty to these offenses would be a violation of that supervised release or probation or parole or whatever supervision you were on previously.

So do you understand that by pleading guilty to these offenses, it could trigger a violation for that if you were on that?  I don't know if you were or weren't --

THE DEFENDANT:  Yes.

THE COURT:  -- but if so --

THE DEFENDANT:  Yes, I understand.

THE COURT:  You understand?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Do you understand that federal parole has been abolished and that you will not be released on parole if you are sent to prison?

THE DEFENDANT:  Correct.

THE COURT:  Do you also understand that by pleading guilty and by waiving the rights that I am discussing with you, you cannot later come to any court and claim that you were not guilty or that your rights were violated.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Frazier, do you understand that the offenses to which you intend to plead guilty are felony offenses?  That if your plea is accepted by me, you will be adjudged guilty of the offenses and that such adjudication may deprive you of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of firearm.

Do you understand that, sir?

THE DEFENDANT:  Yes.

THE COURT:  Do you also understand that a plea of guilty may be used against you by the government in a possible civil action to collect taxes and penalties if they were pursuing that?

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Do you also understand that you will be ordered to pay restitution for any harm that has been caused by the crimes to which you are pleading guilty?

Do you understand that, sir?

THE DEFENDANT:  Yes.

THE COURT:  And also, if you have a professional license, Mr. Frazier, it could be revoked or suspended as a result of your guilty plea.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You have certain constitutional rights, Mr. Frazier, which I would like to explain to you.  I want you to listen carefully because when I have finished, I'm going to ask you if you understand all of those rights and have any questions about any of them.  There are a number of them, so I will ask you about that at the end.

First, you are presumed innocent, Mr. Frazier, and the government in a trial would have to be -- would be required, rather, to prove your guilt beyond a reasonable doubt before you could be found guilty.

You have a right to challenge before trial the manner or way in which the government obtained evidence against you.  If the court ruled that the government illegally obtained evidence, that evidence could not be used at your trial.

You have the right to plead not guilty and have your case heard by a jury of 12 people.  You have the right to a jury -- rather, you have a right to a jury drawn of peers from the residents of the district of this court, and you would get to help your attorney select who is on the jury.

In order to find you guilty, the verdict of the jury must be unanimous.  That means that all 12 jurors must agree that you were proven by the government guilty beyond a reasonable doubt.

At a trial, the government's witnesses would have to come to court and testify in your presence, and you would have

the right to confront and cross-examine them.  That is, you and your attorney would be in the courtroom and they would face, see, hear, and question the government's witnesses against you.

At a trial, you have the right to present your own witnesses, including character witnesses, whose testimony alone could raise a reasonable doubt about your guilt.

You could obtain a subpoena, if you chose, or a court order to make witnesses come to court and testify during a trial on your behalf.

At a trial, you would have the right to testify if you chose to do so.  However, at a trial, you do not have to testify or take the witness stand.  No one can force you to do that.  If you elect or decide not to take the witness stand, neither the assisting United States Attorney nor me, as the trial judge, could comment on or make any reference to your failure to testify.  The jury would be told that no inference or suggestion of guilt could be drawn from the fact that you did not testify.

If you were found guilty, you could appeal such a finding of guilt to a higher court, which could set aside or modify the finding of guilt or give you a new trial.

Mr. Frazier, do you understand these rights that I've just explained to you?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions about any one of them?

THE DEFENDANT:  No.

THE COURT:  Do you understand that by pleading guilty, you would be giving up those rights that I just explained to you, sir?

THE DEFENDANT:  Yes.

THE COURT:  Knowing what your rights are and knowing that you would be giving up those rights by pleading guilty, is it your decision to give up your right to a trial and plead guilty?

THE DEFENDANT:  Yes.

THE COURT:  In order to prove you guilty, Mr. Frazier, the government would have to prove each of the elements of the offenses to which you are pleading guilty, beyond a reasonable doubt.

Now, the attorney for the government will set forth the elements of the offenses to which you intend to plead guilty.  Mr. Brown.

MR. BROWN:  Yes, Your Honor.  As to wire fraud in violation of 18 U.S.C. § 1343, to establish a violation of that statute, the government would have to prove the following elements beyond a reasonable doubt:

First, that the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false

or fraudulent pretenses, representations, or promises;

Second, that the defendant acted with the intent to defraud; and

Third, that in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce, or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

And as to aggravated identity theft in violation of 18 U.S.C. § 1028A, to establish a violation of that statute, the government must prove the following elements beyond reasonable doubt:

First, that the defendant knowingly transferred, possessed, or used another person's means of identification;

Second, that the defendant did so without lawful authority; and

Third, that the defendant did so during and in relation to certain enumerated crimes, which includes wire fraud.

THE COURT:  Thank you, Counsel.

Mr. Smith, have you explained the nature and the elements of the offenses to your client and discussed it with him?

MR. SMITH:  I have, Your Honor.

24

THE COURT:  Thank you.

Mr. Frazier, has your lawyer explained the elements of the charges to you, sir?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions regarding the elements of the charges?

THE DEFENDANT:  No.

THE COURT:  I'm going to ask the government's attorney to now recite the facts to which the government contends it would prove beyond a reasonable doubt if you were to go to trial.  I will ask you, Mr. Frazier, to listen carefully because when counsel is finished, I'm going to ask you if that is, in fact, what happened and if you did what the government says you did.

Mr. Brown.

MR. BROWN:  Yes, Your Honor.

And this is on page 3 of the Guilty Plea Memorandum. If this case were to proceed to trial, the government would prove the following facts:

In the summer of 2022, special agents from the Federal Deposit Insurance Corporation Office of Inspector General began to investigate a financial fraud group chat on the Telegram app, which was called New Scam Philly GC Update. The information on this Telegram group chat included methods for its members to fraudulently obtain COVID-19 emergency

relief funds, unemployment benefits, and other bank information.  Members of the group also advertised for sale bank account access information and personally identifiable information.

One member of the Telegram group, identified as Sum10 Smoov3, S-U-M-1-0 S-M-O-O-V-3, advertised that he worked for a bank and was able to sell bank account information.  An undercover member of the FDIC OIG group communicated with this individual and set up a deal to purchase bank account information for $250.  Sum10 Smoov3 provided to the undercover agent his Cash App handle of Black Diamond AP for the payment.  The undercover agent paid $250 to Sum10 Smoov3 via this Cash App handle.

Sum10 Smoov3 then sent the undercover agent debit card information for a US Bank customer.  This information included the name of an individual, whose initials are ▌▌▌▌, ▌▌▌▌'s US Bank debit card number, ▌▌▌▌'s mailing address, ▌▌▌▌'s debit card expiration date, and ▌▌▌▌'s card verification value, which is the CVV code on the card.

Special agents from FDIC OIG investigated the Cash App handle and determined that it belonged to the defendant. Subsequent investigation showed that the defendant was employed by US Bank and had conducted a recorded customer service call with ▌▌▌▌, in which he solicited and received the above information from ▌▌▌▌  As a result, the defendant knew that

████ was a real person and that those means of identification belonged to ████

As part of the defendant's scheme to defraud by stealing banking information, the defendant had recorded the information of at least one other US Bank customer and had caused wire communications to be sent from outside Pennsylvania to the Eastern District of Pennsylvania as follows, and this is a chart which is the same as the chart that's on page 3 of the indictment, and it shows that on July 31st, 2022, August 27th of 2022, October 1st of 2022, November 2nd of 2022, and again on November 2nd of 2022, the defendant caused wire communications to be sent from outside of Pennsylvania to within the Eastern District of Pennsylvania in furtherance of this wire fraud scheme.

THE COURT:  Thank you, Counsel.

Mr. Frazier, did you listen to and hear what the attorney for the government, Mr. Brown, said the government would show at trial?

THE DEFENDANT:  Yes.

THE COURT:  Is that, in fact, what happened, sir?

THE DEFENDANT:  Yes.

THE COURT:  Did you do what the government says you did?

THE DEFENDANT:  Yes.

THE COURT:  I will now ask counsel if anything else

needs to be added to the colloquy.  I will ask you both after I pose a series of questions if you agree with what I have put forth.

Questions are as follows:  Counsel, are you satisfied that there is a factual basis for the plea?  That the defendant is competent to enter the plea?  That the defendant's willingness to plead guilty is voluntary?  That the guilty plea is not based on any plea agreement or promises, other than what is disclosed on this record?  That the guilty plea is being made with the full understanding by the defendant of the nature of the charges, the maximum possible penalty and, if it was applicable, any mandatory minimum penalty provided by law?  And the defendant's legal rights to contest the charges?

Mr. Smith, are you satisfied?

MR. SMITH:  I am so satisfied, Your Honor.

THE COURT:  Thank you.

Mr. Brown, are you satisfied?

MR. BROWN:  Your Honor, I may have missed this, but just to confirm, there were no promises or assurances to induce the plea.  That may have been covered already.

THE COURT:  It was not, but I know there is no plea agreement that this is an open plea, and I did state that.

MR. BROWN:  Yes, Your Honor.  This would be in addition there have been no promises or assurances that haven't been reduced to writing to induce the plea.

THE COURT:  Understood.  I also have the inquiry.

Mr. Smith, I'm sorry, just --

MR. SMITH:  I apologize.  That is correct.

THE COURT:  Okay.  Thank you very much.  I also --

MR. BROWN:  Your Honor, apologies.  I think we also need to hear that from the defendant.  That's the defendant's understanding, as well.

THE COURT:  Correct.

Counsel -- or rather, I'm sorry, Mr. Frazier, there have been no other promises or anything made to you in order for you to enter this plea, correct?

THE DEFENDANT:  Yes?

MR. SMITH:  May I, Your Honor?

THE COURT:  You may.

(Counsel confers with client.)

THE DEFENDANT:  Correct, Your Honor.

THE COURT:  And so after speaking with your counsel, he has further explained to you that there have been no other promises or things offered to you in order to get you to plead guilty, correct?

THE DEFENDANT:  Correct.

THE COURT:  Okay.

The question that I have for both counsel is, do you wish to sidebar regarding a supplemental seal in this -- is there any need to sidebar for any reason?

MR. BROWN:  No, Your Honor, not at this time.

THE COURT:  Okay.

MR. SMITH:  Not at this time, Your Honor.

THE COURT:  Thank you very much.

Counsel, after hearing from both of you regarding your satisfaction with the colloquy that I have given to the defendant, I do find that the defendant is fully competent and capable of entering an informed plea.  I find that the defendant does understand the charges.  He understands his legal rights, and he understands the maximum possible penalty in this case.  And the defendant also understands that he is giving up his right to a trial by pleading guilty.

At this point in time, Mr. Frazier, I'm going to ask you to please stand.  Mr. Frazier, are you prepared to enter your plea, sir?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  I will ask you to keep your voice up.  I will ask my deputy to take the plea.

COURTROOM DEPUTY:.  Mr. Frazier, you previously entered a plea of non-guilty to Bill of Indictment No. 24-173, charging you with Counts 1 through 5, wire fraud, in violation of 18 U.S.C. § 1343, and Count 7, aggravated identity theft in violation of 18 U.S.C. § 128A(a)(1), (c)(1) and (c)(5).

How do you plead now as to Counts 1 through 5?

THE DEFENDANT:  Guilty.

COURTROOM DEPUTY:.  And how do you plead now as to Count 7?

THE DEFENDANT:  Guilty.

COURTROOM DEPUTY:.  Thank you.

THE COURT:  Mr. Frazier, do you have any questions about anything that has happened here today?

THE DEFENDANT:  No.

THE COURT:  Were all the answers that you gave to the court truthful?

THE DEFENDANT:  Yes.

THE COURT:  I now find, Mr. Frazier, that the plea you have just entered has been knowingly, intelligently, and voluntarily given and is not the result of any force or threats or any promises that have been made to you.  The plea is supported by an independent basis, in fact, containing each of the essential elements of the offenses to which you have pled guilty.

I accept your plea of guilty, sir, and I find and adjudge you, Mr. Frazier, guilty of the following offenses: Counts 1 through 5, wire fraud, which is pursuant to section 18 U.S.C. § 1343, and Count 7, aggravated identity theft, Title 18 U.S.C. § 1028A.

The sentencing in this matter, Mr. Frazier, is going to be scheduled for March 25th, 2026 at 10 a.m., here in this courtroom.  That's March 2-5.

The court has been in receipt of the bail status report from Pretrial Services.  Pretrial Services has recommended the same bail and conditions of release be continued for Mr. Frazier pending sentencing.

My understanding, Mr. Frazier, is that you have been compliant with all the conditions that have been put upon you and you were being supervised out in California where you currently reside.  I'm going to ask Mr. Brown, do you have any position regarding bail insofar as Mr. Frazier is concerned?

MR. BROWN:  What the court just outlined is fine with the government, Your Honor.

THE COURT:  Thank you.

Mr. Smith, do you have any commentary or anything regarding the bail insofar as your client is concerned?

MR. SMITH:  Nothing.  I think the court stated it accurately.

THE COURT:  Okay.  Then I am going to order that the bail and conditions of release as previously entered and having been modified by the court probably to allow you to relocate or return back to California, that those conditions remain in effect for you, sir.  So you will abide by the same conditions that you have been abiding by up and to this point.

And at this point in time, the only other question I have really is to the government, which is, does the court -- or rather does the government have a motion as to Count 6 of

the indictment?

MR. BROWN:  Yes, Your Honor.  The government does, and I believe we put it on the docket a few days ago.

THE COURT:  You did.

MR. BROWN:  It's a motion to dismiss Count 6 of the indictment.

THE COURT:  And Mr. Smith, I'm going to assume that you have no objection to that motion?

MR. SMITH:  There is no objection to the government's motion.

THE COURT:  And so with that, the court will grant the motion, and so I will go ahead and sign the order dismissing Count 6 of the indictment.  And that will conclude that specific charge.

Is there anything else that I need to address before we conclude things here today, Mr. Brown?

MR. BROWN:  No, Your Honor.

THE COURT:  Thank you.

Anything further, Mr. Smith?

MR. SMITH:  The only thing I would just bring to the court's attention, I see the sentencing date of March 25th.  I did advise Mr. Brown this; based on some of the anticipated mitigation, I am looking to prepare for sentencing, it is possible I may reach out to the court and ask to extend that sentencing date.  I'll wait closer in time to see where I am,

but I just wanted to bring that to the court's attention now.

THE COURT:  Could you tell me, Mr. Smith, why do you anticipate that it is -- I mean, because I know sometimes for certain types of crimes, there may be obviously some paper things that need to be accumulated in terms of restitution, but tell me why?

MR. SMITH:  I anticipate, just based on the statements regarding Mr. Frazier's mental health and his treatment, I wish to obtain those records.  I likely may retain a doctor who will then want to review those records, may then want to meet with Mr. Frazier and prepare a report.  Given the time it takes sometimes to procure records, I'm not suggesting it can't be done by March 25th, but in anticipation of the fact that it could possibly extend later, I just wanted to at least put that on the court's radar now.

THE COURT:  I appreciate that, Mr. Smith.  I do acknowledge that everything you've stated is reasonable and understandable.  I prefer not to set dates and then to reset dates, but however, I know you aren't really certain at this point --

MR. SMITH:  That's correct.

THE COURT:  -- as to what timeline you will need.  So would you prefer that I extend it now at the outset?  Or keep the date as is and just, kind of, see what you're able to accumulate by March 25th?

MR. SMITH:  I will defer to what will work better for the court, but if the court is willing to extend it now, perhaps that would be the cleanest way now and I can get the ball rolling and I know exactly what my timeframe is.

THE COURT:  Okay.  In light of what you said and understanding kind of what the steps are that you'll have to take in this regard, I'm going to extend it by 60 days.  So I'd like a date, approximately 60 days.  I'd like a date in May, and we'll go ahead and set that now.  And then hopefully that, I believe, will be more than enough time for you to obtain what you need to obtain.

And equally for the government, if there's anything regarding monies that needs to be kind of meted out or discussed, you and counsel can discuss that and have all of that taken care of also in the same timeframe.

So if we could have a date in May?

(Judge and Deputy confer.)

THE COURT:  Okay, we're going -- in light of the Memorial Day holiday, we're going to go to June 2nd.

MR. SMITH:  June 2nd.

THE COURT:  In light -- and the court's calendar, considering both of those things.

MR. BROWN:  Would that be at 10 a.m., Your Honor?

THE COURT:  Yes.

MR. SMITH:  I hate to do this, may I at least ask is

June 3rd available?

THE COURT:  Yes.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Government, is that fine?  June 3rd?

MR. BROWN:   Yes, Your Honor.  We'll make that work.

THE COURT:  Okay.  June 3rd, 10 a.m.

MR. SMITH:  Thank you.

THE COURT:  Here in this courtroom, that's when the sentencing.

Mr. Frazier, please abide by all the terms and conditions that have currently been put in place.  In essence, keep doing what you're doing, sir, and then I will see you in June.  Continue to communicate with your counsel actively so that everything that needs to be in place by June is in place so that we can move forward, because I'm not going to be inclined to continue this beyond that.

MR. SMITH:  Certainly.

THE COURT:  All right.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  If there's no further business before the court, then the court's going to stand adjourned.  Anything further?  Government, Mr. Brown?

MR. BROWN:  No, Your Honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  Good luck, Mr. Frazier.  I'll see you in June.

THE DEFENDANT:  Thank you.

COURTROOM DEPUTY:.  All rise.

THE COURT:  We'll stand and recess.

(Proceedings adjourned at 1:08 p.m.)

                          CERTIFICATION

I, **Elaine M. LaRosee**, court approved transcriber, Certify that the forgoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Elaine M. LaRosee*_   May 21, 2026